FILED

Alexander Baker, Plaintiff Pro Se
3505 8th Ave
Los Angeles, CA. 90018
tel: 323-313-7653

2017 APR 17  AM 9: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

350 W. First Street,  Los Angeles, CA. 90012

| | |
|---|---|
| Alexander Baker <br><br><br> Plaintiff, <br><br> vs. <br><br> Firstcom Music, a Unit of Universal Music-Z Tunes, LLC et. al. <br><br><br><br> Defendants. | Case: 2:16-cv-08931-VAP(JPRx) <br><br> PLAINTIFF'S RICO CASE STATEMENT |

To the Court, all parties, and their attorneys of record:

This RICO Case Statement includes those facts upon which Plaintiff is relying and which were obtained as a result of the "reasonable inquiry" required by Federal Rule of Civil Procedure 11. In particular, this statement is in a form which uses the numbers and letters as set forth in the Court's order, and states in detail and with specificity the information required under the Court's order.

**1.  State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962(a), (b), (c), or (d).**

The unlawful conduct of Defendants is in violation of 18 U.S.C. § 1962 (c) and (d).

**2.  List each defendant and state the alleged misconduct and basis of liability of each defendant.**

The RICO Defendants are:

**Firstcom Music, a Unit of Universal Music Z-Tunes, LLC**  ("Firstcom") is a Production Music company with headquarters in Carrolton, Texas and an office in Santa Monica, California. Once an independent company, FirstCom is now believed to be wholly owned by entertainment conglomerate Universal Music Group, itself owned by the multi-national conglomerate Vivendi. Firstcom profits by acquiring master rights and publishing rights to pieces of recorded music, then selling licenses allowing performance of that music in TV shows and other media. During each 6-month period from 2007-2015, Firstcom received greater than $1000 in revenue on illegally-obtained music titles authored by Plaintiff and others.

**Kenneth "Ken" Nelson** ("Ken Nelson" or "Mr. Nelson") is Senior Vice President of Firstcom, a position he has held since the mid-1990's. On behalf of Firstcom, Mr. Nelson obtains copyright to recorded music masters by contracting with music production companies on a "work-for-hire" basis; and the copyrights to Compositions by

contracting with music authors through so-called "Writer Inducement Contracts". Mr. Nelson's role in the Music Laundering Enterprise is that he devised and executed a scheme by which a continuous source of licensable music is obtained through false promises of proper authorship registration, and false promises of correct performance reporting, then given the appearance of legitimacy with forged and otherwise falsified Writer Inducement Contracts. Mr. Nelson also devised and executed a scheme to enrich himself and the Enterprise by selling "Direct Licenses", i.e. music synchronization and master licenses which permit the licensor to perform the music without reporting usage to the proper Performance Rights Organizations, e.g. ASCAP and BMI.

**Jenifer Carpenter** ("Jenifer Carpenter" or "Ms. Carpenter") is Executive Assistant to Mr. Nelson at Firstcom, a position she has held since the mid-1990's. Ms. Carpenter is responsible for submitting copyright, authorship and publishing registrations to the Library of Congress and to Performance Rights Organizations such as ASCAP and BMI. Ms. Carpenter's role in the Music Laundering Enterprise is to falsify such registrations whenever necessary, to create the appearance of legitimacy, while at the same time diverting money away from the authors to whom it belongs, and into the hands of the Enterprise conspirators.

**Clara Veseliza Baker a/k/a Clair Marlo,** (hereafter "Clair Marlo" or "Ms. Marlo") is a music composer, producer, and publisher now living in Sherman Oaks, California. Ms. Marlo's role in the Music Laundering Enterprise is to forge the Plaintiff's signature on contracts, to omit other composers from authorship registration, to submit false authorship information which favors herself, and which disfavors Plaintiff and others, to create secret bank accounts into which Direct License royalty money is gathered, and to generally tell whatever lies are required to induce Plaintiff and other composers to create licensable music for the Music Laundering Enterprise.

///

**3.  List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

**Darren Schmidt** - attorney for FirstCom / Universal Music Group - In 2007, Schmidt helped execute a plan to divest Plaintiff of performance royalties due by falsely stating that Sprout did not perform Plaintiff's song, falsely stating that FirstCom would not pursue legal action against Sprout whether Sprout had used the song or not, and falsely stating that Plaintiff had no right to pursue an infringement claim against Sprout.

In 2016 Schmidt refused to cooperate with a Court Order in California State Case LD068701, the Baker-Marlo divorce case, which order required parties to equalize royalty payments between them. Schmidt further refused to provide Plaintiff with his tax documents on file at Universal Music Group, claiming that Universal did not have a W-9 on file, despite issuing 1099 forms to Baker.

**Loretta Munoz** - VP at ASCAP - In 2007 stated "I don't know what [Mr. Baker] thinks he heard, but it certainly wasn't his song", in reference to Sprout having actually performed the song 35,000 times without a license. As set forth in the Complaint, it is possible that Ms. Munoz was merely repeating the lie that she had been fed by FirstCom.

**Johnson & Murphy Productions, LLC** - without license, incorporated Plaintiff's song "See What The Animals Do" into numerous promotional videos it created for Sprout. Johnson & Murphy were validly served Summons and Complaint in this matter, by a registered process server, at the address on file as agent for service of process with the California Secretary of State. The Clerk has entered default against this Defendant.

**4.  List the alleged victims, and state how each victim was allegedly injured.**

**Alexander Baker** - Mr. Baker was injured by the dollar amount of performance royalties which he would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Billy Trudel -** Mr. Trudel was injured by the dollar amount of performance royalties which he would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Bruce Watson -** Mr. Watson was injured by the dollar amount of performance royalties which he would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise

**Ken Stacey -** Mr. Stacey was injured by the dollar amount of performance royalties which he would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Windy Wagner -** Ms. Wagner  was injured by the dollar amount of performance royalties which she would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Keely Hawkes -** Ms. Hawkes  was injured by the dollar amount of performance royalties which she would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Heather Donovan -** Ms. Donovan  was injured by the dollar amount of performance royalties which she would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Nir Averbuch -** Mr. Averbuch was injured by the dollar amount of performance royalties which he would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

**Does** - An unknown number of other songwriter / music producers were injured by the dollar amount of performance royalties which they would have received had authorships been registered correctly, and had music been licensed legitimately, instead of under Direct Licenses and the other above-mentioned schemes perpetrated by the Music Laundering Enterprise.

5. **Describe in detail the pattern of racketeering activity . . . alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:**

   a) **List the alleged predicate acts and the specific statutes which were allegedly violated;**

   The ongoing pattern of predicate acts here consists of criminal Copyright Infringement - 17 U.S.C. § 506; Wire Fraud - 18 U.S.C. § 1343; and Mail Fraud - 18 U.S.C. § 1341.

   b) **Provide the dates of predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

   18 U.S.C. § 1341 Mail Fraud took place each time FirstCom's Jenifer Carpenter, at Ken Nelson's instruction, mailed a contract across state lines to Clair Marlo, all RICO Defendants knowing that the contract falsely promised that composers would be entitled to collect performance royalties. Mail Fraud also took place each time Clair Marlo mailed a contract back to FirstCom, knowing that the signed contract contained forgeries, in addition to knowing that the contract falsely promised that composers would be entitled to collect performance royalties. The dates of such fraudulent contracts are July 26, 2007, February 25, 2008, May 21, 2008 (and September 12, 2008 addendum), January 1, 2009 May 12, 2009, January 14, 2010, May 18, 2010  (and July 4, 2010 addendum), December 2, 2010, March 17, 2011, March 1, 2012 (and March 20, 2012 addendum), May 16, 2012 (and September 9, 2012 addendum), January 17, 2013.

18 U.S.C. § 1343 Wire Fraud took place each time Clair Marlo knowingly transmitted false authorship information by email across state lines to Ken Nelson, Jenifer Carpenter and FirstCom. Wire Fraud also took place each time Jenifer Carpenter knowingly transmitted false authorship information by internet across state lines to ASCAP, BMI, and to the United States Copyright Office.  The dates of such fraudulent wire communications are directly related to the contract dates stated above, and would occurred within 1-2 months after delivery of music master recordings made pursuant to the fraudulent contracts.

17 U.S.C. § 506 criminal Copyright Infringement took place each time FirstCom collected greater that $1000 in any 6-month period by commercially exploiting the songs listed in Appendix B to the Complaint. The dates of criminal copyright infringement are each and every 6-month period from 2007 - present.

        **c)  If the RICO claim is based in the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

18 U.S.C. § 1341 Mail Fraud took place each time FirstCom's Jenifer Carpenter, at Ken Nelson's instruction, mailed a contract across state lines to Clair Marlo, all RICO Defendants knowing that the contract falsely promised that composers would be entitled to collect performance royalties. Mail Fraud also took place each time Clair Marlo mailed a contract back to FirstCom, knowing that the signed contract contained forgeries, in addition to knowing that the contract falsely promised that composers would be entitled to collect performance royalties, in addition to containing false authorship splits. The dates of such fraudulent contracts are July 26, 2007, February 25, 2008, May 21, 2008 (and September 12, 2008 addendum), January 1, 2009 May 12, 2009, January 14, 2010, May 18, 2010  (and July 4, 2010 addendum), December 2, 2010, March 17, 2011, March

1, 2012 (and March 20, 2012 addendum), May 16, 2012 (and September 9, 2012 addendum), January 17, 2013.

18 U.S.C. § 1343 Wire Fraud took place each time Clair Marlo knowingly transmitted false authorship information by email across state lines to Ken Nelson, Jenifer Carpenter and FirstCom. Wire Fraud also took place each time Jenifer Carpenter knowingly transmitted false authorship information by internet across state lines to ASCAP, BMI, and to the U.S. Copyright Office.  The dates of such fraudulent wire communications are directly related to the contract dates stated above, and would occurred within 1-2 months after delivery of music master recordings made pursuant to the fraudulent contracts.

**d) State whether there has been a criminal conviction for violation of each predicate act;**

To the best of Plaintiff's knowledge, there have been no criminal convictions for predicate acts.

**e) State whether civil litigation has resulted in a judgment in regard to each predicate act;**

Yes, civil litigation resulted in a judgment of $23,505 against Clair Marlo in regard to the predicate acts of criminal copyright infringement, mail fraud, and wire fraud, in case no. 2:16-cv-2313 RGK (JPRx).

**f) Describe how the predicate acts form a "pattern of racketeering activity"; and**

The RICO Defendants execute and deliver by mail across state lines one contract which falsely promises that writers will collect performance royalties, and which contains forgeries. Music writers, such as Plaintiff, are induced to create marketable music under the false belief that they will be given proper authorship credit, and under the false belief that they will be able to collect performance royalties. False authorship credits are then registered with the Performance Rights Organizations, and with the U.S. Copyright Office.

The FirstCom Defendants then commercially exploit the music obtained under the one contract by selling licenses, including Direct Licenses which allow licensors to use music without reporting usage to Performance Rights Organizations. FirstCom then pays Clair Marlo a secret Direct License Royalty, to compensate for Clair Marlo's losses incurred in foregoing performance royalties, and to reward Clair Marlo for obtaining the music under said false pretenses.

The actions described above for one contract are then repeated again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, and again, thus forming a pattern of racketeering activity.

> **g)  State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

Yes, the predicate acts of criminal Copyright Infringement, Mail Fraud and Wire Fraud relate to each other as part of a common plan. The RICO defendants named here - FirstCom, Ken Nelson, Jenifer Carpenter and Clair Marlo - operate a RICO racketeering enterprise dedicated to what shall hereafter be known as "Music Laundering".

In a classic money laundering scheme, conspirators are profiting from an illegal activity, for example drug dealing, prostitution, or loan sharking. The money acquired is "dirty" because it was obtained in great quantity through illegal means, thus difficult to explain. The conspirators then seek to give their ill-gotten money the appearance of legitimacy by also operating some legitimate cash business, such as a laundromat, an arcade, or a theater. The criminals thereby create a plausible explanation for the existence of their continual infusion of new dollars. The ill-gotten money now appears "clean".

Here, the conspirators are profiting from an ongoing pattern of criminal Copyright Infringement plus Mail Fraud and Wire Fraud. They acquire possession of recorded original music by falsely promising the writers of music that they will be properly credited, thus entitled to collect future moneys called "Performance Royalties". The music is "dirty" because it was obtained in great quantity through illegal means, thus

difficult to explain.  The conspirators then seek to give their ill-gotten music the appearance of legitimacy by forging signatures on so-called "Writer Inducement Contracts", which contracts falsely indicate music authorship shares that either ignore completely, or else greatly understate the actual writer's musical contribution; while overstating or wholly fabricating the conspirator's contribution, who typically made no actual musical contribution at all. The criminals thereby create a plausible explanation for the existence of a continual infusion of new music titles, ready to be licensed. The ill-gotten music now appears "clean".

Beginning in the 1980's, Firstcom Music was a pioneer in "Production Music", i.e. maintaining a catalog of recorded music titles to which it owned the necessary rights, and thus could commercially exploit by selling licenses for use in media, especially TV shows. Each time a song is played in a TV show, both the publisher and the writer of the song are entitled to collect money called a "Performance Royalty".

Firstcom prospered, was purchased by a larger record company, then another, and then ultimately was acquired by Universal Music Group, one of the largest entertainment conglomerates on Earth.

Beginning in the mid 1990's, Plaintiff Alexander Baker and Defendant Clair Marlo, a husband-wife music writing partnership doing business as Invisible Hand Productions, entered into a long string of contracts with Firstcom, under which they created a great number of musical works, many of which were successfully licensed for use on TV shows. In the beginning of their partnership, Mr. Baker and Ms. Marlo agreed to split writer credits on all Production Music equally, and in the beginning, they both contributed equally to the music. However, after the birth of their first daughter in 1996, Mr. Baker did about 99% of the music writing and studio production, while Ms. Marlo handled 100% of the business side, including all contracts and communications with Firstcom.

By the mid-2000s, Firstcom faced problems. The market for Production Music had become much more crowded and competitive than it had formerly been. This is

Firstcom's "Competition Problem". In 2006-2007, Firstcom was in the process of being acquired by Universal. To remain competitive, Universal and Firstcom devised a scheme called "Direct Licensing". Direct Licensing means selling a license for use of music on a TV show, with the understanding that the buyer is not obligated to report the usage, thus bypassing Performance Royalties that would otherwise be due to the writer and publisher. While representing an attractive discount option for clients, Firstcom understood that Direct Licensing runs afoul of its standard contract with writers, which promises that writers retain their "writer share" of Performance Royalties. While Direct Licensing addresses the Competition Problem, it creates a new problem - how to get their music writer-producers to continue creating product, while agreeing to forego future Performance Royalty income. This is the "Direct License Problem".

In 2006-2007, Firstcom had yet another another problem. Alexander Baker and Clair Marlo had discovered that TV network Sprout was performing their Firstcom song "See What The Animals Do" on a regular basis, without a license. Eventually the performances totaled at least 3500 in number, and by Plaintiff's estimate, it was 30,000. When Firstcom mysteriously denied that the song was being used at all, Alexander Baker threatened to sue Sprout for Copyright Infringement. In the resulting communications, this became known as the "Sprout Promo Situation". By all accounts, Firstcom senior VP Ken Nelson was furious with Alexander Baker for having been a "loose cannon".

As angry as Ken Nelson was with Alexander Baker, he would likely have simply refused to hire him ever again, if not for the fact that he knew that Mr. Baker had a proven track record of creating marketable Production Music, and creating it by the ton. Firstcom had made a lot of money from exploiting Mr. Baker's work, and wanted to "keep the gravy train rolling". Plus, Ken Nelson wanted Firstcom to be compensated for the unlicensed performances on Sprout, while at the same time wanting to convince Mr. Baker to forego his own interests. This is the "Sprout Promo Problem".

Meanwhile, Clair Marlo also had a problem. Her husband, Alexander Baker, had sex outside the marriage. She could not forgive him and wanted to punish him as severely

as possible. She likely would have left the marriage, if not for the fact that she too wanted to continue to exploit Mr. Baker's musical talents and "keep the gravy train rolling". This is Clair Marlo's "Revenge Problem".

In 2007, Ken Nelson, his assistant Jenifer Carpenter and Clair Marlo hit upon a scheme intended to solve all of their respective problems. This cooperative structure between Defendants Firstcom, Ken Nelson, Jenifer Carpenter, and Clair Marlo is hereafter referred to as "The Music Laundering Enterprise" or "The Enterprise". Music Laundering as implemented by The Enterprise works to address Firstcom's Competition Problem, the Direct Licensing Problem, the Sprout Promo Problem and Clair Marlo's Revenge Problem, as follows.

To induce Clair Marlo to forego some significant writer royalties, while continuing to deliver a steady stream of new music, a secret and hitherto unprecedented royalty stream was created, payable by Universal to Invisible Hand Productions. Ms. Marlo secretly re-registered Invisible Hand Productions into her own name by filing a new Fictitious Business Name Statement. Besides secretly and solely collecting this new royalty stream, Ms. Marlo could now unilaterally enter into the work-for-hire contracts.

To further induce Clair Marlo, the Music Laundering scheme called for Ms. Marlo to be given a 75% share, or a 90% share, or even a 100% share of music titles which were actually created solely by Mr. Baker, rather than the 50% share per their long-standing ghostwriting agreement. Of course, Mr. Baker would never agree to give up any percentage of his writer shares, nor would he agree with Direct Licensing, so the Music Laundering scheme required Ms. Marlo to forge Mr. Baker's signature on the Writer Inducement Contracts which establish writer "splits".

As Mr. Baker's wife and business partner, Ms. Marlo was uniquely positioned to effectuate the Music Laundering scheme with Firstcom.

In 2007, the Enterprise informed Alexander Baker that he was prohibited from suing or taking any legal action against Sprout. The Enterprise further stated that Firstcom would take no action against Sprout, and had no position on whether the song

being played on Sprout was or was not "See What The Animals Do". With Mr. Baker silenced and restrained, Firstcom then immediately sued Sprout, ultimately settling for an undisclosed payment, while successfully depriving Alexander Baker from suing or collecting any Performance Royalties at all.

From 2007-2015, the Enterprise continuously operated in an ongoing pattern of Music Laundering, obtaining original music through false promises of proper credit made to Mr. Baker and at least 6 other writers, then executing false and forged Writer Inducement Contracts, or in several cases proceeding on Writer Inducement Contracts which were not signed at all. The contracts were sent through the U.S. Mail from California to Texas. The false authorship registrations were transmitted from Firstcom in Texas to ASCAP and BMI in California, while false copyright registrations were transmitted to the U.S. Library of Congress in Washington DC.

Continuously well-stocked with laundered music since 2007, the Enterprise has now successfully licensed some vast number of expropriated musical works for use on a long list of TV shows.

6. **Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:**

   a) **State the names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

FirstCom Music, a Unit of Universal Music-Z Tunes, LLC; Kenneth "Ken" Nelson, Jenifer Carpenter and Clair Marlo.

   b) **Describe the structure, purpose, function and course of conduct of the enterprise;**

**Structure** - The Structure of the Music Laundering Enterprise is understood as follows. FirstCom is a production music company, which profits by selling licenses for use of recorded music on TV and other media, whether rights to such music were

acquired legally or illegally. Ken Nelson is the boss. Nelson commissions the creation of vast quantities of production music, via work-for-hire contracts and writer inducement contracts. Nelson directs that licenses be sold, whether the music rights were acquired legally, or illegally under false promises of correct authorship registrations and false promises of correct performance reporting. Jenifer Carpenter is Nelson's assistant, who handles administrative duties such as registering music titles and authorship registrations with the Performance Rights Organizations, and with the U.S. Copyright Office. Carpenter performs her duties, whether the registrations are legitimate or fraudulent. Clair Marlo is in charge of obtaining possession of recorded music, and delivering it to Nelson and Carpenter, whether possession was accomplished legally, or through false promises of correct authorship registration, and false promises of proper performance reporting.

**Purpose** - The purpose of the Music Laundering Enterprise is to make money by commercially exploiting production music, by selling licenses for usage of the music on TV, and other media, whether rights to such music were acquired legally or illegally, and whether such licenses require the Licensor to properly report performances, or not.

**Function** - The function of the Music Laundering Enterprise is obtain production music that has the appearance of contractual legitimacy, whether actually legitimate or not; by promising writers the ability to collect Performance Royalties, whether such promise is true or not; and to remain competitive in the production music market, whether doing so entails selling Direct Licenses, or not.

**Course of Conduct** - The course of conduct of the Music Laundering conspirators is as follows. On behalf of FirstCom, Ken Nelson offers a contract which promises that writers will collect performance royalties, knowing full well that he will sell Direct Licenses that bypass performance royalties. Clair Marlo accepts such a contract, knowing that the contract language regarding performance royalties is false, but also knowing that a secret Direct License payment scheme has been set up in compensation. Clair Marlo falsely tells co-writers, including but not limited to Plaintiff, that authorship registrations

will be accurate, and that performance royalties will be paid. Clair Marlo then forges Plaintiff's signature on Writer Inducement contract, or else leaves Plaintiff's signature line blank, knowing that writer "splits" are false, and knowing that the co-writer has not agreed to forgo performance royalties, Clair Marlo then delivers said fraudulent contracts, ill-gotten music masters and false authorship information to Jenifer Carpenter. Carpenter then registers music works with Performance Rights Organizations and U.S. Copyright Office, with full knowledge that contracts are forged and/or unsigned by victims.

**c) State whether any defendants are employees, officers or directors of the alleged enterprise;**

RICO defendant Ken Nelson is Executive VP of FirstCom. RICO Defendant Jenifer Carpenter is Nelson's executive assistant, thus an employee of FirstCom. RICO Defendant Clair Marlo is a long-time contractor with FirstCom. However RICO Defendant FirstCom is not the RICO Music Laundering Enterprise, because FirstCom also consists of other individuals with various titles and positions, and whose conduct is unknown to Plaintiff, and whose conduct may be entirely legitimate.

**d) State whether any defendants are associated with the alleged enterprise;**

RICO Defendant FirstCom is associated with the Music Laundering Enterprise. RICO defendant Ken Nelson is associated with the Music Laundering Enterprise. RICO Defendant Jenifer Carpenter is associated with the Music Laundering Enterprise. RICO Defendant Clair Marlo is associated with the Music Laundering Enterprise.

**e) State whether the claimant is alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

The RICO Music Laundering Enterprise is comprised of the combined activities of Ken Nelson, Jenifer Carpenter, Clair Marlo and FirstCom, who may be considered members of the enterprise. Thus, the RICO Defendants are individuals (Nelson,

Carpenter, Marlo) and an entity (FirstCom) separate from the Music Laundering Enterprise. The RICO Defendants are not the Music Laundering Enterprise itself.

**f) If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

FirstCom is a perpetrator, because FirstCom profits by selling licenses for the use of illegally obtained music. Ken Nelson is a perpetrator, because he devised and now executes a scheme by which music is obtained under false promises that performances will be reported and performance royalties will be paid. Jenifer Carpenter is a perpetrator because she files false authorship registrations with Performance Rights Organizations and the U.S. Copyright Office, knowing they are false. Clair Marlo is a perpetrator, because she forges contracts, and promises correct authorship registration, and does not reveal to co-writers, including Plaintiff, that she has secretly agreed with Nelson and FirstCom to allow Direct Licensing, and to collect secret royalties in compensation therefrom.

**7. State and describe in detail whether the claimant is alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The pattern of racketeering activity consists of that conduct which has been termed "Music Laundering", i.e. the commercial exploitation of music obtained through false promises of proper authorship registrations, and false promises of performance royalties being paid. The enterprise consists of the RICO Defendants and their various instruments, such as computers, which facilitate the purpose of the Enterprise (as set forth above in 6(b), the relationships among FirstCom, Ken Nelson, Jenifer Carpenter, Clair Marlo and FirstCom (as set forth throughout), and the longevity of the enterprise, 2007-present (as set forth throughout).

Thus, a clear distinction is drawn between the patten and the enterprise, which remain separate: The pattern is *the conduct* of Music Laundering, the enterprise is the *Defendants engaged in the conduct* of Music Laundering. By analogy, the pattern is "the game being played", while the enterprise is "the team playing the game".

**8. Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

Besides operating the RICO Music Laundering Enterprise, as described above, Ken Nelson and Jenfier Carpenter may also operate FirstCom as a legitimate production music business, which obtains and commercially exploits music legally, by insisting on correct authorship registrations, and by insisting on proper reporting of music performances. Besides operating the RICO Music Laundering Enterprise, as described above, Clair Marlo may also operate a legitimate music production company, by collaborating with music co-writers on mutually agreed terms, by producing music, by correctly reporting all authorships, by requiring all co-writers to sign the proper contracts, by not forging anybody's signature, and by refusing to allow FirstCom to sell Direct Licenses, absent explicit contractual language allowing them to do so, and upon informed written consent by all affected co-writers, and all affected Performance Rights Organizations, (assuming that such Direct Licenses are not in fatal conflict with applicable statutory and case law).

**9. Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

The Music Laundering Enterprise receives money in the form of fees collected on sales of Direct Licenses.

**10. Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

FirstCom, in Texas, contracts with Clair Marlo, in California, to create music which is then licensed to TV shows and other media throughout the U.S., and throughout the world, which music is then performed for national and international audiences.

11. **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

      a) **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

      b) **Describe the use or investment of such income.**

Not applicable.

12. **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Not applicable.

13. **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

      a) **State who is employed by or associated with the enterprise; and**

Ken Nelson, Jenifer Carpenter, Clair Marlo and FirstCom are associated with the RICO Music Laundering Enterprise.

      b) **State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

Ken Nelson is liable as a § 1962(c) "person", Ken Nelson is not the Music Laundering Enterprise. Jenifer Carpenter is liable as a § 1962(c) "person", Jenifer Carpenter is not the Music Laundering Enterprise. Clair Marlo is liable as a § 1962(c) "person", Clair Marlo is not the Music Laundering Enterprise. FirstCom is liable as a § 1962(c) "person", FirstCom is not the Music Laundering Enterprise.

14. **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

FirstCom, Ken Nelson, Jenifer Carpenter and Clair Marlo each knew at all relevant times that Direct Licensing runs afoul of the contractual language promising that music writers will be paid Performance Royalties, yet agreed to engage in Direct Licensing anyway. FirstCom, Ken Nelson, Jenifer Carpenter and Clair Marlo each knew at all relevant times that contracts must be executed to be valid; that many contracts purporting to control Plaintiff's musical works were and remain unsigned; thus presumably were not agreed to; yet RICO Defendants have all agreed to commercially exploit Plaintiff's music anyway.

FirstCom, Ken Nelson, Jenifer Carpenter and Clair Marlo each knew at all relevant times that Invisible Hand Productions was a partnership business belonging equally to Clair Marlo and Plaintiff; RICO Defendants devised and executed with full knowledge a plan for Clair Marlo to convert ownership of said business by taking out a fraudulent Fictitious Business Name Statement, by submitting at least one fraudulent IRS form W-9 to FirstCom, such W-9 form(s) falsely claiming sole ownership of Invisible Hand Productions for Clair Marlo;  by secretly closing a joint business account, and secretly opening a sole bank account; by directing a secret royalty stream from FirstCom to said sole bank account; by agreeing between all RICO Defendants to conceal these facts from Plaintiff, so as to continue to commercially exploit Plaintiff's musical talent for as long as possible, knowing that Plaintiff would never agree to forego contract money and performance royalties due.

15. **Describe the alleged injury to business or property.**

Plaintiff's business and property damages are an amount equal to the sum of all prices of all contracts identified in Appendix A, plus the sum of all license fees generated by Firstcom on all songs listed in Appendix B, plus the sum of all performance royalties

rightly due to plaintiff but paid to others, including performance royalties not paid at all because of Direct Licensing.

### 16. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

But for the RICO defendants conspiring to conceal and otherwise misrepresent the facts around and Plaintiff's legal rights pertaining to Sprout performing Plaintiff's song "See What The Animals Do" at least 3500 times, Plaintiff would have collected performance royalties due on at least 3500 performances, 30,000 performances by Plaintiff's estimate.

But for Direct Licensing, Licensors would be required to report music performances to the Performance Rights Organizations, such as ASCAP and BMI, who would then tabulate a Performance Royalty due, and would pay Plaintiff and others the appropriate amount, rather than zero payment, as is presently the case.

But for the false authorship registrations, Plaintiff and others would receive correct royalty payments, i.e. royalty payments that are greater than the present inaccurate payments.

### 17. List the damages sustained for which each defendant is allegedly liable.

**On the First Claim for Relief (RICO Music Laundering) against FirstCom, Nelson, Carpenter and Marlo**

**Special Damages** - For business and property damages, the Court should award Plaintiff an amount equal to the sum of all prices of all contracts identified in Appendix A, plus the sum of all license fees generated by Firstcom on all songs listed in Appendix B, plus the sum of all performance royalties rightly due to plaintiff but paid to others, such amounts proven at trial, added together, and then trebled by statute, plus pre-judgment interest according to statute, plus reasonable attorney fees (if any) and costs.

**On the Second Claim for Relief (Conspiracy to RICO) against FirstCom, Nelson, Carpenter and Marlo**

     **Special Damages** - For business and property damages, the Court should award Plaintiff an amount equal to the sum of all prices of all contracts identified in Appendix A, plus the sum of all license fees generated by Firstcom on all songs listed in Appendix B, plus the sum of all performance royalties rightly due to plaintiff but paid to others, such amounts proven at trial, added together, and then trebled by statute, plus pre-judgment interest according to statute, plus reasonable attorney fees (if any) and costs.

18. **List all other federal causes of action, if any, and provide the relevant statute numbers.**

     Copyright Infringement - 17 U.S.C. §101 et. seq.

19. **List all supplemental state claims, if any.**

     Breach of Fiduciary Duty, Fraud, Conversion

20. **Provide any additional information that would be helpful to the Court in processing the RICO claim.**

     Plaintiff hereby incorporates by reference the Complaint, Appendix A, Appendix B, and Exhibits 1-25 filed contemporaneously with the Complaint.

Dated April 14, 2017

Alexander Baker
Plaintiff Pro Se
3505 8th Ave.
Los Angeles, CA.  90018